## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| **DEBRA MAE STEWARD,** | ) | |
| | ) | **No. 13 CV 4595** |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Magistrate Judge Young B. Kim** |
| | ) | |
| **CAROLYN W. COLVIN, Acting** | ) | |
| **Commissioner of Social Security** | ) | |
| **Administration,** | ) | |
| | ) | **March 10, 2015** |
| **Defendant.** | ) | |

### MEMORANDUM OPINION and ORDER

Debra Mae Steward, a former United Airlines flight attendant, claims that she became disabled on September 11, 2001, because of her reaction to the infamous terror attacks perpetrated on that day. According to Steward a litany of disabling medical problems resulting directly and indirectly from the 9/11 attacks, in conjunction with other medical conditions, render her unable to work. After the Appeals Council declined to review the administrative law judge's ("ALJ") decision denying her benefits, Steward filed this suit seeking judicial review. *See* 42 U.S.C. § 405(g). Before the court is Steward's motion for summary judgment. For the following reasons, the motion is denied, and the Commissioner's final decision is affirmed:

### Procedural History

On March 29, 2007, Steward filed a Title II application for disability insurance benefits ("DIB"), and then on March 26, 2008, she filed a Title XVI

application for supplemental security income ("SSI"). (Administrative Record ("A.R.") 11.) Steward alleged in her applications a disability onset date of September 11, 2001. (Id.) After the Commissioner denied her applications initially and upon reconsideration, Steward requested and was granted a hearing before an ALJ. (Id.) Steward failed to appear for her hearing on June 10, 2009, but she received another hearing that took place on March 1, 2010. (Id.) On August 10, 2010, the assigned ALJ denied Steward's applications. (Id. at 24.) The Appeals Council declined review, (id. at 5-7), making the ALJ's decision the final decision of the Commissioner, *see Schomas v. Colvin,* 732 F.3d 702, 707 (7th Cir. 2013). In June 2013 Steward filed this lawsuit seeking judicial review of the Commissioner's decision. S*ee* 42 U.S.C. § 405(g). The parties have consented to this court's jurisdiction. (R. 15.)

## Facts

On September 11, 2001, the day that a group of terrorists perpetrated coordinated attacks along the eastern seaboard of the United States by hijacking four commercial passenger jets, Steward was employed as a flight attendant by United Airlines. Steward worked a flight from Columbus, Ohio, to Chicago the morning of the attacks. (A.R. 539.) After landing in Chicago and concluding her shift, Steward became aware of the terror attacks from a radio announcement while driving away from the employee parking lot at O'Hare International Airport. (Id.) According to Steward, that was the moment when she became disabled, although she continued her employment with United Airlines into 2002, and has held several

other jobs since that time, one lasting for more than six months.  At her March 2010 hearing before an ALJ, Steward presented documentary and testimonial evidence in support of her disability claims.

## A.    Medical Evidence

Although Steward's alleged disability onset date is September 11, 2001, her medical record does not begin until early 2002.  On February 13, 2002, Steward was admitted to the emergency room at Linden Oaks Hospital.  (A.R. 696.)  The intake notes state that Steward was "an alcoholic and gets extremely depressed when she relapsed [sic].  This time, the same thing happened."  (Id.)  Less than three weeks later, on March 5, 2002, she presented to the emergency room at Rush Copley Hospital as "very psychotic," reported hallucinations urging her to commit suicide, and appeared to be responding to internal stimuli during her interview with hospital staff.  (Id. at 620.)  Steward reported that she was laid off from United Airlines in January 2002 and reported that she was "very scared after September 11."  (Id.)  Treating physicians diagnosed Steward with psychosis and depressive disorder.  (Id.)  However, the record does not contain any evidence that Steward sought medical treatment for any of these conditions until almost two years later in early 2004 when she began receiving treatment from the staff psychiatrists at the DuPage County Health Department ("DCHD").  (Id. at 492.)  On January 14, 2004, Steward saw Dr. Hasina Javed for the first time and Dr. Javed assessed that Steward was suffering from major depressive disorder and alcohol dependence.  (Id.)  According to Dr. Javed, Steward informed him during this meeting that she suffers

from "severe PTSD because of her experience of being in a flight after September 11th." (Id.)

In May 2004, Steward informed a different treating psychiatrist at DCHD, Dr. Naveen Maddineni, that her "best friend was involved in one of the 09-11 incidents[.]" (Id. at 483.) Although Steward reported that she was suffering from PTSD, Dr. Maddineni noted that PTSD was "questionable." (Id.) The record does not appear to contain any other reference to the "best friend," although Steward reported in her hearing that she "had just flown with" one of the flight attendants who was killed during the 9/11 attacks. (Id. at 924.) The notes from subsequent psychiatric appointments at DCHD show that Steward referred to September 11 or to PTSD more generally and instead focused more of her attention on her alcohol abuse, depression, and family problems. (Id. at 214, 474, 478, 479.) For example, in August 2004 Steward told a DCHS staff psychiatrist, Dr. Dennis Geylana, that she was recently laid off from her job because her depression and low energy caused her to miss a week of work. (Id. at 478.) In September 2005 Steward reported to Dr. Javed about family tension, but said that she was sober and was compliant with her medication. (Id. at 460.) During this visit she denied having symptoms of PTSD and further denied any sleep problems or "feeling of hopelessness, helplessness, or worthlessness." (Id.) Steward's medical records also demonstrate that she frequently missed or rescheduled her psychiatric appointments. (See id. at 464, 466, 467, 470, 475, 485-88, 493.)

More recent mental health records reflect that Steward became angry that her providers had not diagnosed her with PTSD and that she was determined to obtain disability benefits based on this condition. On September 27, 2007, Steward told a DCHS staff psychiatrist, Dr. Kavita Shah, that "she needs to be approved for disability" benefits for PTSD and that "[i]f I don't get disability approved, I don't know who could?" (Id. at 432.) About a month later, on November 1, 2007, Steward told Dr. Shah that "I have all these problems and I will see to it that I get disability." (Id. at 430.) On February 11, 2008, Dr. Shah reported that Steward was still "[c]onvinced that the current situation she is in is because of 9/11," and that she was entitled to receive disability benefits. (Id. at 529.) During her May 1, 2008 visit with Dr. Shah, Steward complained to him that she was denied disability benefits even though her friend gets disability benefits based on PTSD. (Id. at 535.) Steward's medical records do not contain any evidence or suggestion that she has ever been diagnosed with PTSD.

Steward's physicians have consistently focused on her alcohol dependence, (*see, e.g.,* id. at 186, 191, 266, 270, 460, 616, 621), even though she occasionally has been angered by their interest in her alcohol use, (id. at 430). Steward's alcohol abuse has caused her to report to the emergency room and has also landed her in trouble with the law. For example, in April 2005 Steward reported to the emergency room with a blood alcohol level of 0.3% and returned a few days later again intoxicated but refusing treatment. (Id. at 266-71.) Hospital staff notified the police when Steward attempted to leave the hospital in her car and the police

arrested her for driving under the influence and for resisting arrest. (Id. at 272.) But the record indicates that when Steward takes her medication for depression and abstains from alcohol, her condition improves. (Id. at 456, 460, 471.) On October 1, 2007, Dr. Joseph Mehr issued a functional capacity assessment of Steward, noting her history of alcohol dependence and depression and commenting that she "seems to have a high opinion of her station in life, and externalizes blame for her current situation." (Id. at 320.)

Between her claimed disability onset date of September 11, 2001, and the date of her hearing, March 1, 2010, Steward sought treatment for a host of other physical maladies, including issues with her Eustachian tubes, sinuses, (id. at 240-41), knees, (id. at 169, 176, 188), and bowels, (id. at 403-07). The origins of some of these ailments predate 9/11 or did not arise until long after 9/11. For example, Steward's Eustachian tube issues began in the 1990s, (id. at 496), she sought treatment for bowel adhesions in 1996, (id.), and she has had chronic pain in her left knee since she was a teenager, (id. at 497). In January 2006, Steward sought treatment for a torn ACL in her right knee, which was surgically repaired two months later. (Id. at 188.) In July 2006, Steward sought treatment for post-operative knee pain through "trigger point" injections. (Id. at 173, 176.) When nerve block injections proved to be unsuccessful, Steward sought more prescription painkillers. (Id. at 178.) Steward has also continued treatment for her sinus pain, including surgical treatment in March 2007. (Id. at 234-35.)

**B.  Hearing Testimony**

On March 1, 2010, four witnesses testified at the hearing before the ALJ: Steward, Courtney Boyda, Dr. Kathleen O'Brien, and Dr. Timothy Tansey. (A.R. 917.)  Steward was represented by counsel at the hearing.  (Id. at 916.)

**1.  Debra Steward**

At her hearing, Steward testified about her past work history.  According to Steward, she was unable to work after the 9/11 attacks.  In Steward's words, she was unable to work as a flight attendant because:

> I had just flown with one of the girls that went down in Shanksville.[1]  I read Todd Beamer's[2] book and I know that they cut the flight crew's throats with box cutters.  And that's my, why I get scared.  And there's [sic] so many coincidences.  I, in the early '80s worked in a building across from the World Trade Center, and that was my subway stop. And just so many things, I grew up in Wheaton, Todd Beamer went to Wheaton College.  There are just – it happened to my family, my United family.

(Id. at 924.)  But Steward admitted at the hearing that she continued to work at United Airlines after 9/11 as a flight attendant and that she stopped working when she was laid off in 2002.  (Id. at 923.)  She also acknowledged that many others in the industry lost their jobs during this period.  (Id.)

---

[1]  United Airlines Flight 93 crashed into a field near Shanksville, Pennsylvania, on September 11, 2001, resulting in a total loss of life for all aboard.  *The 9/11 Comm'n Report* at 14, www.9-11commission.gov/report/911Report.pdf (last visited March 9, 2015).

[2]  Todd Beamer was a passenger on United Airlines Flight 93.  *The 9/11 Comm'n Report* at 456, n.79.  The court presumes that Steward was referring to a book authored by Todd Beamer's widow, Lisa Beamer.  *See* Lisa Beamer with Ken Abraham, *Let's Roll: Ordinary People, Extraordinary Courage* (Tyndale, 2005).

The ALJ also questioned Steward about her employment in the years that followed her dismissal from United Airlines. Steward testified that she worked at Target for more than six months after she was laid off by United Airlines. (Id.) According to Steward, she quit her job at Target because "when boxes of merchandise came in, we were supposed to use box cutters to open them. And I had a real problem using a box cutter because those were used in 9/11." (Id.) Steward's attorney conceded at the hearing that her employment at Target from June 2004 to January 2005 did not qualify as an unsuccessful work attempt, and that it was inconsistent with the alleged onset date of Steward's disability. (Id. at 922.) As such, Steward's counsel advised the ALJ that, "I wouldn't object to changing the onset date to [January 2005]." (Id. at 923.) Steward also testified that she worked at Regal Mortgage for approximately four months, but stopped working there when a person who was mentoring her fell ill and died. (Id. at 921.) But according to Steward, even if her mentor had not fallen ill, she would not have been able to continue working at Regal Mortgage because she did not have the requisite knowledge of the mortgage business. (Id. at 923.)

Steward and her attorney did not concede at the hearing that Steward does not suffer from PTSD, (id. at 928, 947-48, 951-2), despite the ALJ's admonition that the record did not contain a diagnosis of PTSD, (id. at 948). Steward also testified that she is a recovering alcoholic and that she had been sober for approximately three years as of her hearing date. (Id. at 927 ("And in addition to that, the three-plus years I've had varying degrees of sobriety, one year, two year.").) Steward

testified that alcohol abuse caused her to experience symptoms of withdrawal, (id. at 927-28), and to be arrested for DUI resulting in the loss of her driver's license, (id. at 924). Steward regularly attends AA meetings and has sponsored other AA members herself. (Id. at 924, 927).

Steward also testified about other medical problems she has experienced. Steward said that she has been treated for heart problems, (id. at 933), bladder problems, (id. at 933-34), hearing loss, (id. at 935), sinus problems, (id. at 931), and knee problems, (id. at 934). Steward testified that she smokes a pack of cigarettes every day. (Id. at 925.) As for medication, Steward testified that she was taking Effexor, Abilify, Lorazepam, Trileptal, Ranitidine, Simvastatin, Atenolol, Mirapex, Meclizine, Trazodone, and Ultram for various ailments. (Id.) But Steward also explained that her various ailments do not prevent her from accomplishing the routine tasks of life: she shops for groceries by herself, cleans her own apartment, and does her own laundry. (Id. at 930, 934). Steward testified that she has hobbies but that she no longer engages in them. Instead, she spends most of her time on the couch or in front of the television. (Id. at 939.) Her goal, however, is to start biking and walking again. (Id. at 940.)

### 2. Courtney Boyda

Courtney Boyda testified at the hearing that she was a case manager for DuPage County Permanent Supportive Housing Program known as the PADS Program and that she was familiar with Steward because Steward was a resident in one of the housing units under her supervision. (Id. at 942-44.) Boyda testified that

as part of her PADS Program responsibilities she visits Steward's unit every other week.  (Id. at 944.)  She observed during these visits that sometimes Steward was "okay," while other times she was "weepy" and her apartment was "disheveled." (Id.)  Boyda testified that, "[o]ccasionally I'll come over and everything will be taken care of, her house will be clean, her appearances [sic] will be great and she's up to doing things.  She'll be able to go out and do some things.  However most of the time when I see her . . . she'll talk about having this appointment or having that appointment."  (Id. at 945.)  In response to the questions of Steward's attorney, Boyda testified that she did not notice alcohol on Steward's breath or see any alcohol in the unit during her visits.  (Id.)

### 3.  Medical Expert

Dr. Kathleen O'Brien, a licensed clinical psychologist and a board certified forensic psychologist, testified at Steward's hearing as a medical expert ("ME"). After reviewing Steward's medical records, the ME opined that Steward suffers from major depression with psychosis in remission, alcohol dependence, and Cluster B personality disorder symptoms.  (Id. at 950-51.)    The ME further testified that Steward does have "mild difficulties with activities of daily living; mild difficulties with concentration, persistence and pace," and that Steward had not had any recent episodes of decompensation.  (Id. at 950.)  The ME further opined that many of Steward's difficulties were attributable to alcohol dependence.  (Id.)  The ME also explained at the hearing that while PTSD was "mentioned" in Steward's medical

records, two psychiatrists have determined that PTSD was not "an active diagnosis." (Id. at 951-52.) The ME concurred with this opinion. (Id.)

### 4. Vocational Expert

Vocational expert ("VE") Timothy Tansey, Psy.D. testified that he had reviewed Steward's file and had come to the conclusion that Steward was capable of working her past relevant work as a stock checker because it was an unskilled occupation that had a light physical exertion level. (Id. at 961.) The VE also testified that although Steward was not capable of performing past relevant work other than her work as a stock checker, there were approximately 25,000 housekeeping positions and 5,380 mail clerk positions in the local labor market that she was also capable of performing. (Id. at 962.) Upon examination by Steward's attorney, if Steward had to take a 30-minute break every hour, the VE testified that she could not be gainfully employed. (Id. at 963.)

## C. The ALJ's Decision

On August 10, 2010, the ALJ issued a decision finding that Steward is not disabled. In applying the standard five-step sequence for assessing disability, *Kastner v. Astrue*, 607 F.3d 642, 646 (7th Cir. 2012), the ALJ found at step one that Steward has engaged in substantial gainful activity, but that this activity did not constitute disqualifying substantial gainful activity. (A.R. 13.) Following her alleged disability onset date of September 11, 2001, Steward earned $12,680.17 in 2002, a sum that equals average monthly earnings of $1,056.60, exceeding the $780 per month threshold of substantial gainful activity in that year. (Id.) However, in

the years that followed, Steward fell below the threshold of substantial gainful activity: in 2003 she earned $2,650.64; in 2004 she earned $10,192.45; in 2005 she earned $5,062.95; and in 2007 she earned $1,092.14. (Id.) Because Steward did not engage in substantial gainful activity after 2003, the ALJ proceeded to the next step in the sequential evaluation. (Id.)

At step two, the ALJ determined that Steward "has the severe impairments of major depressive disorder with psychosis, alcohol dependence in apparent remission, and a Cluster B personality disorder[.]" (A.R. 14.) The ALJ noted that Steward's depressive symptoms became particularly problematic when she abused alcohol. (Id.) Although Steward alleged numerous other disabling conditions, including intestinal adhesions, sinus pain, Eustachian tube dysfunction, a 2006 ACL tear, osteopenia, a reducible hernia, back pain, and hearing loss, the ALJ determined that these conditions were not "severe" as that term is defined in the Social Security Act because they did not meet the two-part test of being: (1) medically documented; and (2) functionally limiting to the claimant for a period of more than 12 months. (Id. at 14-16.)

At step three, the ALJ determined that Steward does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. § 404. (Id. at 16.) In reaching this determination, the ALJ relied on Steward's medical evidence and the testimony of the ME, who found that when Steward drank, her mental impairments imposed marked restrictions on her activities of daily living, social functioning,

concentration, and other abilities, but that when she was not drinking, her impairments imposed only mild restrictions. (Id.) Relying on this opinion, the ALJ found that Steward failed to meet the Paragraph B criteria. (Id.)

Before turning to step four of the required analysis, the ALJ found that Steward has the RFC to perform medium work as defined by 20 C.F.R. §§ 404.1567(c) and 416.967(c), except that she is limited by her mental impairments to "simple unskilled work that can be easily learned, and which does not involve more than average production requirements." (A.R. 17.) The ALJ found Steward's statements concerning the intensity, persistence, and limiting effects of her impairments not credible primarily based on Steward's explicit statements to her doctors that she was determined to receive disability benefits, and the fact that she has never been diagnosed with PTSD, despite repeated characterizations by Steward that she was entitled to disability benefits because of PTSD. (Id. at 18.)

Then at step four, the ALJ found that Steward is capable of performing her past relevant work as a stock checker, an occupation that is considered to be "light in physical demand and unskilled." (Id. at 22.) Based on these findings, the ALJ concluded that Steward is not under a disability as defined by the Social Security Act and denied her application for benefits.

## Analysis

According to Steward, the ALJ committed the following reversible errors: (1) analytical and procedural errors at steps two and three; (2) an erroneous RFC determination; and (3) a "patently wrong" credibility determination. (R. 24, Pl.'s

Br. at 1.)  In reviewing the ALJ's decision, this court takes an "extremely limited" role by asking only whether the decision was both explained and supported by substantial evidence.  *See Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).  An ALJ will meet the substantial evidence standard so long as the ALJ relied on adequate evidence in the record and explained "why contrary evidence does not persuade." *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008).  This deferential standard of review embodies the principle that federal district courts should not "displace the ALJ's determinations by reconsidering facts or evidence, or by making independent credibility determinations." *Elder*, 529 F.3d at 413.  So long as the decision is supported by substantial evidence and the ALJ has explained why contrary evidence is unpersuasive, this court will affirm the ALJ's decision "even if reasonable minds could differ" as to whether Steward is disabled.  *See Simila v. Astrue*, 573 F. 3d 503, 513 (7th Cir. 2009).

## A.  Step-Two Determination

Steward first argues that the ALJ erred in failing to include PTSD as a severe impairment.  (R. 24, Pl.'s Br. at 9-10.)  Steward manages to criticize the ALJ for failing "to accord controlling weight to the opinions of Steward's psychiatrists," with respect to what she calls her "depression/PTSD."  (R. 24, Pl.'s Br. at 9-10.) This argument is a contrivance, and a bad one at that.  Preliminarily, the ALJ did find that Steward suffers from major depressive disorder with psychosis.  (A.R. 14.) But more importantly, Steward's treating mental health specialists never diagnosed her with PTSD, a point that the ALJ raised during the hearing and for which

Steward did not have an explanation. (Id. at 928.) At the hearing, Steward wondered whether "a social worker with a Master's" had ever diagnosed her with PTSD, but then stated "the depression that I have with the psychosis is much worse, I believe." (Id.) In her brief, Steward cryptically charges that "[t]he source of the ALJ's error at this point is his reliance upon the forensic psychologist who served as an ME at the hearing." (R. 24, Pl.'s Br. at 10.) In questioning the ME at the hearing, Steward's counsel attempted to conflate PTSD with psychosis in apparent remission in order to argue that Steward was disabled because she was psychotic:

> Steward's Attorney: You didn't hear anything [from Steward's hearing testimony] that might indicate that this claimant had any problems resulting from psychotic features or other depressive features?

> ME: Now, wait a minute. You're confusing psychotic features with depressive features, and they're nowhere near the same thing. She reported a good deal of depressed features. She did not report that she's having ongoing auditory or visual hallucinations, or has an active delusional system that keeps her out of the realm of reality. That's not going on. She's very cogent, very coherent, she's able to testify, she's able to answer questions. There's no evidence that she's being disturbed by internal stimulant.

> Attorney: Oh, there wasn't? You didn't see her breakdown and start crying when she was talking about the people at 9/11 that she experienced?

> ME: That's not psychotic.

> Attorney: Well, I think that's where it comes from.

> ME: Well, you may think that but that's not psychotic.

(Id. at 954.) The ME relied upon Steward's medical records to render her opinion that Steward does not have PTSD and that Steward was not psychotic. (Id. at 955.)

An ALJ cannot find that a severe impairment exists if there is no evidence to support such a finding. *Berger*, 516 F.3d at 544. Because Steward has never been diagnosed with PTSD and because there is no evidence that she is psychotic beyond the notes from one emergency room visit in March 2002, the ALJ properly refused to make a finding that Steward has these severe impairments.

Steward also argues that the ALJ committed a reversible error by failing to determine that she suffers from the severe impairments of Eustachian tube dysfunction, asthma, sinusitis, acute bronchitis, facial pain, headaches, and hearing loss, "all of which may combine to affect her ability to work." (R. 24, Pl.'s Br. at 8.) Steward seems to focus her attention on the Eustachian tube dysfunction and sinus pain, claiming that the ALJ's opinion is flawed because it "relegates a very serious impairment that has a major impact upon an individual's ability to function in the workplace, 8 hours per day, 5 days per week to a non-severe impairment." (R. 24, Pl.'s Br. at 9.) The basis for Steward's challenge is a few treatment records and a letter from Dr. Jay Dutton, an ENT specialist who in 2007 wrote a letter to the Social Security Administration stating that Steward's "Eustachian tube dysfunction and serious otitis episodes were so debilitating that they contributed to preventing her from working as a flight attendant." (A.R. 312.) Dr. Dutton also noted that Steward "has undergone multiple sinus surgeries as well as aggressive medical therapy to bring her chronic sinusitis under control." (Id.)

In response, the Commissioner argues that the ALJ properly considered and rejected a finding of a "severe impairment" related to Steward's Eustachian tubes and sinuses. (R. 33, Govt.'s Br. at 3.) According to the ALJ:

> The documentary record also reflects a host of conditions that are not "severe" . . . . She has had treatment in the past in the form of surgery, narcotic pain medication, and Botox injections for sinus pain and pressure and a Eustachian tube dysfunction from an . . . ENT specialist, Dr. Dutton . . . . A June 5, 2009 treatment note reflects improvement . . . and there is nothing in the record to suggest that this malady has imposed work-related limitations that persisted for 12 continuous months.

(A.R. 14-15.) The Commissioner argues that none of the ENT issues Steward identifies is "severe," and that "Dr. Dutton did not specify how much — let alone for how long — the [Eustachian tube] problems limited Plaintiff's capability to do most jobs." (R. 33, Govt.'s Br. at 3.) The Commissioner also rightly points out that Dr. Dutton only referred to Steward's former employment as a flight attendant, a job that she had not worked for approximately six years by the time of his letter. (Id.) Even more puzzling is that Steward experienced sinus problems as early as 1993, almost a decade before she was laid off from her job at United Airlines. What is clear though is that the ALJ reasonably found that Steward failed to meet her burden of proving that her Eustachian tube problems qualify as a severe impairment. *See Maggard v. Apfel*, 167 F.3d 376, 380 (7th Cir. 1999). Ultimately, as the Seventh Circuit recently explained in *Curvin v. Colvin*, No. 13 CV 3622, ___ F.3d ___, 2015 WL 542847, at *3 (7th Cir. Feb. 11, 2015), so long as the ALJ "properly considered all of [a claimant's] severe and non-severe impairments, the objective medical evidence, her symptoms, and her credibility when determining her

RFC immediately after step 3," any error at step two would be harmless. The ALJ's RFC determination in this case satisfies those requirements and makes any error at step two harmless. (*See* A.R. 17-18.)

The court also notes that Steward's arguments with respect to the ALJ's step-two analysis are procedurally defective in that they are vague and underdeveloped. Underdeveloped arguments are not acceptable and are insufficient to show that a remand is warranted. *See Hunt v. Astrue,* No. 10 CV 2874, 2012 WL 1044744, at *8 (N.D. Ill. Mar. 26, 2012) (rejecting underdeveloped arguments that the ALJ should have found a severe impairment); *Smith v. Colvin*, No. 13 CV 945, 2014 WL 3396527, at *4 (S.D. Ind. July 10, 2014) (same).

## B.      Step-Three Determination

Steward complains that the ALJ's step-three finding, that Steward does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments, was "perfunctory." (R. 24, Pl.'s Br. at 13.) Steward asserts that the ALJ's determination is erroneous because he "fail[ed] to utilize the special technique for assessment of mental illnesses, 404.1520a." (Id. at 11.) The special technique referenced by Steward is set out in 20 C.F.R. § 404.1520a and is employed to "analyze whether a claimant has a medically determinable mental impairment and whether that impairment causes functional limitations." *Craft v. Astrue*, 539 F.3d 668, 674 (7th Cir. 2008). The special technique essentially asks ALJs to determine whether the claimant has "a medically determinable impairment," and if so, "the ALJ must document that finding and rate the degree of

functional limitation in four broad areas: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation," known as the "B criteria." *Id.* (citing 20 C.F.R. § 404 subpt. P, app. 1).

Steward complains that the ALJ "[did] not . . . analyze any of the elements that would substantiate a mental impairment nor does the evaluation of the 'B' criteria refer to any medical or testimonial evidence to substantiate [the ALJ's] conclusions." (R. 24, Pl.'s Br. at 13.) That statement is flatly wrong. The ALJ found that Steward does have the severe impairments of major depressive disorder with psychosis, alcohol dependence in apparent remission, and a Cluster B personality disorder. (A.R. 14.) The ALJ formed this opinion relying on the testimony of the ME, a board certified forensic psychologist. (Id. at 20-21.) The ALJ also discussed Steward's activities of daily living (noting that she "does her own grocery shopping" and "her own laundry at her boyfriend's house"), social functioning (noting Steward's case manager at her supportive housing program testified "sometimes the claimant is OK and sometimes her house and her person are disheveled and she is weepy"), concentration (noting the letter dated July 17, 2009, in which a housing coordinator "reported that the claimant has a host of depressive symptoms and memory deficits which impact her ability to perform her daily activities"), and episodes of decompensation ("[t]he longitudinal medical record indicates that when the claimant is not using substances and is taking her medications regularly as prescribed she can function"). (Id. at 17-21.)

Steward does not identify with particularity what she believes the ALJ should have done differently to render a satisfactory analysis of the special technique. Even if the ALJ's application of the special technique in this case is not a model for compliance the ALJ nevertheless discussed the functional areas and supported his determination about Steward's ability to work with numerous citations to testimony and medical evidence. (See A.R. 16-22.) That is sufficient to discharge his obligation with respect to the special technique. *See Pepper v. Colvin*, 712 F.3d 351, 366-67 (7th Cir. 2013).

Steward also complains that the ALJ "played doctor," but then criticizes him for relying on the uncontradicted opinion and testimony of the ME, who in turn relied upon Steward's medical records. (R.24, Pl.'s Br. at 12-13.) Steward cannot have it both ways by simultaneously arguing that the ALJ "played doctor" and that the ALJ gave too much weight to the ME's testimony. The ALJ was entitled to rely on the ME's objective evidence in evaluating Steward's mental impairments at step three. *See Allen v. Astrue*, 721 F. Supp. 2d 769, 783 (N.D. Ill. 2010). For these reasons, Steward has not shown that the ALJ committed any reversible errors in the course of his step-three determination.

## C.    RFC Determination

Steward next contends that the ALJ's RFC determination is faulty for the following reasons: (1) the ALJ failed to "undertake a functional analysis"; (2) the ALJ failed to "assess Steward's impairments in combination"; and (3) the ALJ failed to substantiate his conclusion that Steward is capable of performing a restricted

range of medium work. (R. 24, Pl.'s Br. at 14.) Steward in essence accuses the ALJ of "ignor[ing] the Acting Commissioner's policies" by failing to provide a "functional assessment" of her capacities. (Id.) But the ALJ's opinion and the record stand in stark contrast to Steward's characterization. The ALJ based his determination that Steward could perform medium work on the testimony of the ME and the VE, multiple reports by Illinois State Disability Determination Services, and the whole of Steward's medical records. (A.R. 21-22.) In particular, the ALJ relied upon the June 2008 opinion of a consultative examiner who found that Steward's knee problems did not impose work-related functional limitations. (Id. at 15.) To the extent that Steward is now trying to argue that some combination of her knee, sinus, and Eustachian tube troubles make her unfit for medium work, Steward herself did not address these issues in her disability hearing. Indeed, Steward herself told medical staff that she did not think she needed hearing aids. (Id. at 116.) Rather, in Steward's reckoning of things, her reaction to the 9/11 terror attacks rendered her incapable of working. (Id. at 924.) Steward has evidently changed course somewhat in her appeal to emphasize her claimed physical limitations, but the ALJ properly explained his refusal to find that these additional conditions were severe.

Steward offers no guidance to the court about how her impairments ought to be considered "in combination" other than to merely state that "[r]estrictions resulting from the combined effects of these impairments do not appear in the RFC." (R. 24, Pl.'s Br. at 14.) In the absence of any specificity, legal citations, or

evidence, Steward makes only an underdeveloped argument, which is inadequate to overturn the decision of the ALJ. *See Hunt,* 2012 WL 1044744, at *8. But even if Steward had developed this argument, it would also fail on the merits because in light of the ALJ's discussion of each of Steward's alleged impairments individually, "the ALJ's statements that [he] examined the 'combination of impairments' at step two, 'considered all symptoms' at step four, and concluded that [Steward] was not disabled" are sufficient to show that the ALJ accounted for all of Steward's symptoms in the aggregate. *Lott v. Colvin*, 541 Fed. App'x 702, 706 (7th Cir. 2013) (noting that "we only require that the ALJ acknowledge having considered the aggregate effect, as long as the ALJ discusses each symptom").

## D.    Credibility Determination

Steward's last objection is that, according to her, the ALJ erred in finding that Steward's "statements concerning the intensity, persistence, and limiting effects of [her] symptoms are not credible to the extent they are inconsistent with the . . . residual functional capacity assessment." (Id. at 18.) In assessing Steward's credibility of a claimant's statements which that are at odds with objective medical evidence, ALJs should consider:

> (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of medication the claimant takes to alleviate pain; (5) treatment, other than medication, that the individual has received for relief of pain; (6) any other measures the individual uses to relieve pain; and (7) any other factors concerning the individual's functional limitations.

*Keller v. Colvin,* No. 13 CV 6029, 2014 WL 6613383, at \*8 (N.D. Ill. Nov. 21, 2014) (citing SSR 96-7p, 1996 WL 374186, at \*2). Steward argues that the ALJ's credibility assessment improperly used boilerplate language, did not rest on sufficient evidence, and considered improper factors. The court addresses these criticisms in turn.

First, Steward's challenge on the basis of the boilerplate language is groundless. While it is true that the Seventh Circuit frowns upon boilerplate language identified in ALJs' credibility determinations, *see Bjornson v. Astrue,* 671 F.3d 640, 644-45 (7th Cir. 2012), use of such language does not itself warrant a remand "[i]f the ALJ has otherwise explained his conclusion adequately," *Filus v. Astrue,* 694 F.3d 863, 868 (7th Cir. 2012). The question then becomes whether the ALJ relied on sufficient evidence and explained his conclusion adequately. Here the ALJ did both. According to the ALJ, Steward's credibility is diminished because her "health progress notes reflect that [she] expresses a sense of entitlement" to receive benefits because "she feels that she is a victim of 911." (A.R. 18.) The ALJ noted the November 2007 psychiatrist visit when Steward told her treating doctor, "I have all these problems and I will see to it that I get disability." (Id. at 430.) The ALJ noted that Steward argued with her treating physician that her diagnosed Axis I alcohol dependence was an error when she reported abstinence from alcohol for one year. (Id.) The ALJ also drew attention to the fact that Steward told her physicians that she has a friend who receives disability benefits for PTSD and stated "[i]f I don't get disability approved, I don't know who could." (Id.) All of those statements

reasonably led the ALJ to conclude that Steward's symptom descriptions were exaggerated and less than credible.

If anything, it appears that the ALJ showed restraint in his understated treatment of Steward's credibility, especially in light of her admission that she falsified a diagnosis of Hepatitis C to her primary care doctors. (*See* id. at 578.) The ALJ noted only that this falsification, in combination with Steward's professed sense of entitlement to disability benefits, strongly suggests that Steward "is capable of making false or exaggerated statements in her pursuit of her goal of obtaining disability." (Id. at 18.) Steward's nonchalance about her falsification does nothing to call the ALJ's opinion into doubt. Steward's attempt to fault the ALJ because he "did not inquire" about the falsification at the hearing is a nonstarter. (R. 24, Pl.'s Br. at 15.) There is nothing "patently wrong" about relying on evidence of a medical falsification when making an adverse credibility determination. *See Masters v. Astrue*, 818 F. Supp. 2d 1054, 1070 (N.D. Ill. 2011) (finding that an ALJ's finding of a claimant's exaggerated or false claims validated the ALJ's conclusion that the claimant lacked credibility). Even Steward concedes that the ALJ properly considered her falsification as an adverse factor in his credibility determination. (R. 24, Pl.'s Br. at 15 ("The ALJ's credibility determination has traction in only one instance. He noted that one of Steward's doctors had recorded that she made a false statement . . . .").)

Finally, Steward asserts that the ALJ relied on improper factors in forming his credibility determination and that he "presented a prejudiced decision by

assuming the outcome prior to marshaling the facts." (Id.) Steward presents no evidence to support the accusation that the ALJ was biased. Steward objects to the ALJ's attention to her continued smoking habit of "at least one pack of cigarettes per day" and her possession of a Bluetooth headset. The ALJ singled out the cigarettes and the Bluetooth device because "[h]er choice to spend money on these items, rather than on the prescription medications that would improve her functioning, tends to suggest that the symptoms were not especially troublesome." (A.R. 20.) Steward's counsel professes not to know what "Blue Tooth" technology is, (R. 24, Pl.'s Br. at 16), but he nevertheless argues that the ALJ should not have considered Steward's possession of it as a factor in her credibility determination. In the first instance, it is not clear how much weight the ALJ gave any of these observations, and it is apparent that Steward's credibility was called into question by other evidence in the record. In light of the numerous and substantial other factors identified by the ALJ that diminish Steward's credibility, his additional consideration of her owning a Bluetooth headset and her smoking habit, regardless of the propriety of such consideration, does not invalidate an otherwise well-justified adverse credibility determination. *See Kittleson v. Astrue*, 362 F. App'x 553, 557-58 (7th Cir. 2010) (noting that a flawed credibility assessment is not "patently wrong" so long as there exists "another, valid reason for finding [a claimant] not credible"). In this case, Steward's obsession with an undiagnosed condition, her repeated statements to her providers of her determination to receive

disability benefits, and her falsification of a hepatitis diagnosis are more than adequate to support the ALJ's analysis of her credibility.

## Conclusion

For the foregoing reasons, Steward's motion for summary judgment is denied and the final decision of the Commissioner is affirmed.

**ENTER:**

_____
**Young B. Kim**
**United States Magistrate Judge**